Argued and submitted January 15; decision of Court of Appeals affirmed, decision of circuit court reversed, and case remanded to circuit court for further proceedings July 9, 2020

Scott Raymond BUSCH,
*Respondent on Review,*
*and*

Deanne Marie BUSCH,
*Plaintiff,*

*v.*

McINNIS WASTE SYSTEMS, INC.,
*Petitioner on Review.*

(CC 15CV13496) (CA A164159) (SC S066098)

468 P3d 419

Plaintiff brought a personal injury claim against defendant after defendant's garbage truck struck plaintiff while he was crossing the street in downtown Portland. As a result of the collision, plaintiff underwent surgery to amputate his leg. Defendant conceded liability, and the jury awarded plaintiff $3,021,922 in economic damages and $10,500,000 in noneconomic damages. Pursuant to ORS 31.710(1), defendant moved to reduce plaintiff's noneconomic damages to $500,000. Plaintiff argued that the jury's damages award should remain intact because ORS 31.710(1) violates the remedy clause of Article I, section 10, of the Oregon Constitution. The trial court reduced the damages in accordance with ORS 31.710. Plaintiff appealed, and the Court of Appeals affirmed. *Held*: ORS 31.710(1) violates the remedy clause of Article I, section 10, because the statute does not provide injured plaintiffs with a *quid pro quo* in exchange for the limited remedy the statute provides, the legislature did not set the cap at an amount that is capable of providing a complete recovery in many cases and would remain capable of doing so over time, and the legislature's reasons for enacting the cap—to lower litigation costs in the hopes that insurance premiums would also decrease—are insufficient standing alone to counterbalance a plaintiff's constitutional right to a remedy for personal injury under Article I, section 10, of the Oregon Constitution.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

On review from the Court of Appeals.*

Julie A. Smith, Cosgrave Vergeer Kester LLP, Portland, argued the cause and filed the briefs for petitioner on review.

_____
* On appeal from Multnomah County Circuit Court, Michael A. Greenlick, Judge. 292 Or App 820, 426 P3d 235 (2018).

W. Eugene Hallman, Hallman Law Office, Pendleton, and Paulson Coletti, Portland, argued the cause and filed the brief for respondent on review.

Janet Schroer, Hart Wagner LLP, Portland, and Cary Silverman, Shook, Hardy & Bacon, L.L.P., Washington DC, filed the brief for *amici curiae* Chamber of Commerce of the United States of America, American Tort Reform Association, American Property Casualty Insurance Association, Medical Professional Liability Association, and Coalition for Litigation Justice, Inc.

Hillary A. Taylor, Keating Jones Hughes, P.C., Portland, filed the brief for *amici curiae* Oregon Medical Association, American Medical Association, and American College of Obstetricians and Gynecologists.

Sharon A. Rudnick, Harrang Long Gary Rudnick P.C., Portland, filed the brief for *amici curiae* Oregon Liability Reform Coalition and National Federation of Independent Business. Also on the brief was Susan Marmaduke.

Nadia H. Dahab, Portland, Travis Eiva, Eugene, and Kathryn Clarke, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Walters, Chief Justice, and Balmer, Nakamoto, Flynn, Duncan, and Nelson, Justices, and Landau, Senior Judge, Justice pro tempore.**

WALTERS, C. J.

The decision of the Court of Appeals is affirmed. The decision of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Landau, S. J., specially concurred in part and dissented in part and filed an opinion.

Balmer, J., dissented and filed an opinion, in which Landau, S. J., joined.

_____

** Garrett, J., did not participate in the consideration or decision of this case.

**WALTERS, C. J.,**

In this personal injury action, we consider, for the first time since this court re-examined the remedy clause of Article I, section 10, of the Oregon Constitution in *Horton v. OHSU*, 359 Or 168, 376 P3d 998 (2016), the constitutionality of a statutory cap on the damages that a plaintiff may recover for injuries resulting from a breach of a common-law duty. Here, plaintiff brought a personal injury claim for damages against defendant, a private entity, and, pursuant to ORS 31.710(1), the trial court reduced the noneconomic damages that the jury awarded—$10,500,000—to the maximum amount permitted by statute—$500,000. The Court of Appeals held that, as applied to plaintiff, the cap violated the remedy clause of Article I, section 10, of the Oregon Constitution and reversed. *Busch v. McInnis Waste Systems, Inc.*, 292 Or App 820, 824, 426 P3d 235 (2018). We affirm the decision of the Court of Appeals and reverse the decision of the circuit court.

## FACTUAL BACKGROUND

Plaintiff had the right-of-way and was walking across a crosswalk in downtown Portland when defendant's garbage truck struck him. By the time the truck stopped, plaintiff's leg was under the truck and attached to his body by a one-inch piece of skin. Plaintiff was fully conscious and alert, and he experienced tremendous pain. Plaintiff had surgery to amputate his leg just above the knee. He has undergone extensive rehabilitation and therapy, but the injuries that plaintiff suffered will affect him for the rest of his life.

Plaintiff filed this action against defendant, a private entity. Defendant admitted liability; the only issue for the jury was the amount of damages to be awarded. The jury determined that plaintiff had sustained, and will sustain, economic damages of $3,021,922 and noneconomic damages of $10,500,000. Defendant subsequently moved to reduce plaintiff's noneconomic damages award to $500,000, in accordance with the cap on noneconomic damages provided in ORS 31.710(1). Plaintiff countered by arguing that, under Article I, section 10, the cap is unconstitutional both

on its face and as applied to plaintiff. The trial court agreed with defendant, granted its motion, and entered judgment accordingly.

Plaintiff appealed, and the Court of Appeals reversed, relying on its decision in *Vasquez v. Double Press Mfg., Inc.*, 288 Or App 503, 406 P3d 225 (2017), *aff'd on other grounds*, 364 Or 609, 437 P3d 1107 (2019).[1] *Busch*, 292 Or App at 824. In *Vasquez*, the Court of Appeals also was faced with the question of whether the damages cap imposed by ORS 31.710(1) could survive a remedy-clause challenge, and the court began its analysis by reviewing this court's decision in *Horton. Vasquez*, 288 Or App at 505. The Court of Appeals took from *Horton* what it considered to be the applicable test for determining whether a damages cap could survive a remedy-clause challenge and considered "'the extent to which the legislature has departed from the common-law model measured against its reasons for doing so.'" *Id.* at 524 (quoting *Horton*, 359 Or at 220). In *Vasquez,* the Court of Appeals noted that, "under the common-law model, plaintiff would have been entitled to recover his noneconomic damages, not subject to any cap," and that

> "[t]he legislature [had] departed fairly dramatically from that model by placing a hard cap on the amount of non-economic damages a plaintiff may recover—a cap that was placed in 1987 and has not since been revisited—with no mechanism for adjustment for the changing value of money or for adjustment based on the relative severity of the injuries sustained by a plaintiff."

*Id.* at 524-25. The legislature had done so, the court said, to "'put a lid on litigation costs, which in turn would help control rising insurance premium costs for Oregonians.'" *Id.* at 525 (quoting *Greist v. Phillips*, 322 Or 281, 299 n 10, 906 P2d 789 (1995)). The court then concluded "that the

---

[1] This court allowed review of *Vasquez*, but we did not issue our opinion until after the Court of Appeals had issued its decision in this case. *Vasquez v. Double Press Mfg., Inc.*, 364 Or 609, 437 P3d 1107 (2019). We resolved *Vasquez* on statutory, rather than constitutional, grounds, holding that the damages cap in ORS 31.710(1) did not apply to the claim at issue there—a worker's claim against a third party for injuries incurred in the course of employment. *Id.* at 633. We reasoned that ORS 31.710(1) specifically excludes claims "subject to *** ORS chapter 656," pertaining to workplace injuries, and that the plaintiff's claim was subject to that chapter. *Id.*

legislature's reason for enacting the noneconomic damages cap—which was not concerned with injured claimants—cannot bear the weight of the dramatic reduction in noneconomic damages that the statute requires for the most grievously injured plaintiffs." *Id.* The court explained that the plaintiff had been "grievously injured" and, if the damages cap imposed by ORS 31.710(1) applied, the plaintiff would receive only $1,839,090 out of the $6,199,090 that the jury had awarded—"only a 'paltry fraction' of the damages that he sustained and would otherwise recover." *Id.* at 525-26. The court held that such a "bare reduction in plaintiff's noneconomic damages without any identifiable statutory *quid pro quo* or constitutional principle that the cap takes into consideration" violated the remedy clause as applied to the plaintiff's case. *Id.* at 526.

As noted, this case came to the Court of Appeals after it had decided *Vasquez*, and the court determined that the two were indistinguishable. *Busch*, 292 Or App at 824. Accordingly, the court reversed the decision of the trial court reducing plaintiff's damages to $3,521,922 and directed the trial court to enter a judgment consistent with the jury's damages award. *Id.* at 824-25. Defendant sought, and we allowed, review.

## THE PARTIES' ARGUMENTS

In this court, defendant does not begin, as the Court of Appeals did in *Vasquez*, with a review of this court's decision in *Horton* and an analysis of the test that that Court of Appeals drew from it. Instead, defendant assumes that the remedy clause of Article I, section 10, places a substantive limit on the legislature's authority and that plaintiffs generally are entitled to a "substantial" remedy for a breach of a recognized duty. Defendant then makes three arguments about why the limited award that plaintiff received in this case is "substantial" and, therefore, in its view, constitutional. First, defendant argues that this court's pre-*Horton* decision in *Greist v. Phillips*, 322 Or 281, 906 P2d 789 (1995), controls and stands for the proposition that a full award of economic damages plus $500,000 in noneconomic damages is a "substantial" remedy for a breach of a common-law duty "in and of itself." Second, defendant argues that a full award

of economic damages plus $500,000 in noneconomic damages necessarily is "substantial" considering the nature and purpose of noneconomic damages. Third, defendant argues that ORS 31.710 provides a "substantial" remedy considering the overall statutory scheme and the legislature's policy reasons for capping noneconomic damages at $500,000.

Although plaintiff responds to and adamantly opposes defendant's arguments about what constitutes a "substantial" remedy, plaintiff also engages more directly with this court's decision in *Horton* and contends that, when the legislature limits the damages that a plaintiff may recover without altering a defendant's duty of care or providing a substitute remedy, that statutory limitation does not comport with Article I, section 10, and is unconstitutional.[2]

## LEGAL BACKGROUND

Article I, section 10, includes the remedy clause that is the subject of our review. It provides:

> "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Or Const, Art I, § 10.

*Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 90, 23 P3d 333 (2001), was the first case in which this court conducted a *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992)-style analysis of that clause.[3] *Horton* re-examined

---

[2] Plaintiff also asks us to revisit a second basis for this court's decision upholding the damages cap at issue in *Horton*: The cap did not violate Article I, section 17, of the Oregon Constitution. In reaching that conclusion, this court overruled *Lakin v. Senco Products, Inc.*, 329 Or 62, 987 P2d 463 (1999). *See Horton*, 359 Or at 249-50 (overruling *Lakin*). Because we hold that ORS 31.710(1) violates Article I, section 10, we do not accept plaintiff's invitation to revisit that aspect of *Horton*.

[3] As the court explained in *Smothers*, "despite [this court's] extensive remedy-clause case law, this court previously [had] not analyzed that clause under the methodology prescribed in *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992)." 332 Or at 90. The methodology prescribed by *Priest* is used for interpreting an original provision of the Oregon Constitution and directs courts to consider the "specific wording [of the provision], the case law surrounding it, and the historical circumstances that led to its creation." *Priest*, 314 Or at 415-16.

and overruled *Smothers*. In doing so, *Horton* character-ized *Smothers* as holding that the meaning of the remedy clause is tied to the Oregon common law in 1857, when the clause was enacted, and that the legislature was prohib-ited from eliminating or modifying a common-law cause of action unless the legislature "provide[d] a constitutionally adequate remedy." *See Horton*, 359 Or at 175-88 (construing *Smothers* and overruling it). *Horton* rejected that interpre-tation of the remedy clause, articulated its understanding of the substantive limit that the remedy clause imposes, and applied that understanding to the damages cap at issue in the case. *Horton* therefore provides the framework for our analysis of the constitutionality of ORS 31.710(1), and we begin by examining its analysis in more detail.

*Horton* was a medical-malpractice case. The defen-dants in *Horton* were the Oregon Health & Science University (OHSU) and Dr. Harrison, a pediatric surgeon employed by OHSU. 359 Or at 171. Harrison had performed surgery on the plaintiff's then six-month-old son and negligently tran-sected blood vessels going to the child's liver. The plaintiff's son had been required to undergo a liver transplant, spleen removal, and additional surgeries, and he would require lifelong medical care. *Id.* at 171. The defendants had admit-ted liability and, following a trial on the issue of damages, the jury had awarded the plaintiff economic damages of $6,071,190 and noneconomic damages of $6,000,000. *Id.*

Following the verdict, the defendants filed a motion to reduce the plaintiff's total damages award to $3,000,000 pursuant to ORS 30.265 and ORS 30.271(3)(a), provisions of the Oregon Tort Claims Act. *Id.* As to OHSU, the trial court granted the motion. The court noted that, because OHSU was a state entity that was entitled to sovereign immunity, the plaintiff would not have had a remedy against OHSU at common law. *Id.* at 171-72. Therefore, the trial court rea-soned, the plaintiff did not have a right to a remedy against OHSU under Article I, section 10, and the legislature was entitled to limit the damages for which that entity was liable. *Id.* The court reached a different conclusion as to Harrison, however, and denied his motion to reduce dam-ages. *Id.* at 172. The trial court reasoned that, in 1857, the plaintiff would have had a remedy against Harrison for

the damages that the child had sustained. *Id.* Accordingly, applying *Smothers*, the court determined that application of the damages cap violated the remedy clause. *Id.* Harrison filed a direct appeal to this court asking that we overrule *Smothers*.[4]

We accepted Harrison's request that we review our holding in *Smothers*. We analyzed whether the *Smothers* holding was correct, *id.* at 178, and determined that the text of the remedy clause did not include, nor did its context support, such a limitation, *id.* at 181. We pointed out that the common law is not static or unchanging; rather, it has "continued to evolve as the premises on which it rests have changed." *Id.* at 182. Thus, "[a]lthough the text and history of the remedy clause were considered at some length in *Smothers*," we were not persuaded "to adhere to a case that was at odds with the text, history, and case law when it was decided and that continues to prove problematic." *Id.* at 187-88. We concluded that the remedy clause does not "lock[] courts and the legislature into a static conception of the common law as it existed in 1857," *id.* at 218-19, and overruled *Smothers*, *id.* at 188.

Having rejected this court's interpretation of the remedy clause in *Smothers*, we were faced with the question of how to correctly describe the clause's parameters. We examined our pre-*Smothers* remedy-clause decisions and characterized them as holding that the remedy clause grants injured persons a substantive right and places a substantive limit on the legislature's ability to modify remedies. *Id.* at 218. We declined "to toss that considered body of decisions aside," and considered how to articulate the nature of that right and the substantive limits it imposes. *Id.*

We decided that *Smothers* had mistakenly viewed the common law as a "procrustean template" and had too tightly tied remedy-clause protections to the common law as it existed in 1857. *Id.* at 197-98. Although we expressly determined that "the remedy clause does not protect only those causes of action that pre-existed 1857," *id.* at 219, we

---

[4] A provision of the Oregon Tort Claims Act, ORS 30.274(3), allows for direct appeals to this court from limited judgments arising from the application of the act's tort claims limitations on damages.

did not completely abandon the common law as a guide. We stated, without difficulty, that "common-law causes of action and remedies provide a baseline for measuring the extent to which subsequent legislation conforms to the basic principles of the remedy clause—ensuring the availability of a remedy for persons injured in their person, property, and reputation." *Id.* at 218. But we found it more challenging to determine when a move away from that baseline is a move too far from those basic principles. It was not easy, we said, "to reduce our remedy-clause decisions to a simple formula." *Id.* at 220.

We observed that our cases had considered three general categories of legislation: At times, the legislature has left a common-law duty intact while eliminating a remedy for injuries cause by a breach of that duty; at other times, the legislature has left a common-law duty intact and has modified only the remedy; and, in other instances, the legislature has eliminated or modified the common-law duty itself. *Id.* at 219-20. From those cases, we concluded that, in deciding whether the legislature's actions impair a person's right to a remedy under Article I, section 10, we had considered, and must continue to consider, "the extent to which the legislature has departed from the common-law model measured against its reasons for doing so." *Id.* at 220.

As a "final consideration" in our analysis of our prior cases, we cautioned against over-reliance on cases decided after *Smothers* and decided "through the lens that [it] provided." *See id.* at 220-21 (discussing this court's post-*Smothers* decisions in *Clarke v. OHSU*, 343 Or 581, 175 P3d 418 (2007), and *Howell v. Boyle*, 353 Or 359, 298 P3d 1 (2013), and cautioning that those cases must be taken with a "grain of salt"). We opined that, "when the legislature does not limit the duty that a defendant owes a plaintiff but limits the size or nature of the remedy," the legislative remedy need not restore all the damages that the plaintiff sustained and that factors, such as the existence of a *quid pro quo*, matter when determining whether a limited remedy is constitutional. *Id.*

With that background in mind, we turned to the application of those principles to the damages cap at

issue—a cap imposed by the Oregon Tort Claims Act.[5] We began by noting that, like other statutes we had considered in the past, the Oregon Tort Claims Act does not eliminate or modify a defendant's duty to an injured plaintiff; rather, it modifies, without eliminating, the remedy available to the plaintiff. 359 Or at 221. Specifically, as applicable to the claim that the plaintiff in *Horton* asserted, we said that the Oregon Tort Claims Act did not modify the duty that the OHSU physicians owed to the plaintiff, who was their patient; rather, it limited the plaintiff's remedy for injuries caused by a breach of that duty. *Id.*[6]

To determine the constitutionality of the cap imposed by the Oregon Tort Claims Act, this court began by noting that the act was a "comprehensive statutory scheme intended to extend benefits to some persons while adjusting the benefits to others." *Id.* at 221. First, we recognized that the state has a constitutionally recognized interest in sovereign immunity. *Id.* We observed that the state acts through its employees, who are not entitled to immunity and that, if the state chose to indemnify its employees for all liability incurred, the state's interest in sovereign immunity would be "eviscerated." *Id.* at 222. But, if the state chose not to indemnify its employees, "few qualified persons would choose to work for the state." *Id.* The legislature's "reason" for passing the Oregon Tort Claims Act was to "avoid[] that dilemma by waiving the state's immunity for its torts but

---

[5] The Oregon Tort Claims Act, codified at ORS 30.260 to 30.300, waives the state's sovereign immunity and, as relevant to this court's decision in *Horton*, limits the tort liability of the state and its employees to $3,000,000. ORS 30.265(1) (explaining that "every public body is subject to civil action for its torts and those of its officers"); ORS 30.271(3)(a) (providing a $3 million limit for claims arising "on or after December 28, 2007, and before July 1, 2011").

[6] As noted, *Horton* purported to set forth three "categories" of statutes that could implicate the remedy clause. *See Horton*, 359 Or at 219-20. We note that *Horton*'s three categories were descriptive only and not entirely clear at that. For example, the categories that it described appear to be overlapping. In the paragraph describing first-category statutes, the court cited two cases discussing the damages cap found in the Oregon Tort Claims Act—*Clarke v. OHSU*, 343 Or 581, 175 P3d 418 (2007), and *Howell v. Boyle*, 353 Or 359, 298 P3d 1 (2013). *Horton*, 359 Or at 219. But the court cited another case discussing the Oregon Tort Claims Act while describing second-category statutes. *Id.* (citing *Hale v. Port of Portland*, 308 Or 508, 783 P2d 506 (1989)). In *Horton*, the court discussed the case before it—which also involved the Oregon Tort Claims Act—as a second-category statute. *Id.* We do not understand the court's description of categories of statutes as providing a "procrustean template" for analysis.

capping the amount for which the state can be held liable."
*Id*. We explained that, "the Tort Claims Act accommodates
the state's constitutionally recognized interest in assert-
ing its sovereign immunity with the need to indemnify its
employees for liability they incur in carrying out state func-
tions." *Id*. at 221.

Second, we explained that the Oregon Tort Claims
Act gives plaintiffs a "*quid pro quo*"—"something that they
would not have had if the state had not partially waived
its immunity." *Id*. at 222. The Oregon Tort Claims Act
waives the state's sovereign immunity up to the damages
limits. ORS 30.265(1). Thus, the act "ensures that a sol-
vent defendant will be available to pay any damages up to
$3,000,000—an assurance that would not be present if the
only person left to pay an injured person's damages were an
uninsured, judgment-proof state employee." *Horton*, 359 Or
at 222.

Third, we recognized that, in setting the cap on state
liability, the 2009 Legislative Assembly had made a studied
and data-driven decision to "provide a complete recovery in
many cases [and] greatly expand the state's liability in the
most egregious cases," by both significantly increasing the
caps and providing for additional, annual, increases indexed
for inflation. *Id*. at 223-24. As a result, in light of the leg-
islature's efforts to accommodate both the state's interests
and plaintiffs' remedy-clause rights, we could not "say that
the $3,000,000 tort claims limit on damages against state
employees is insubstantial in light of the overall statutory
scheme, which extends an assurance of benefits to some
while limiting benefits to others." *Id*. at 224.

But that was not the end of our analysis. As a final
check on the constitutionality of the limited remedy as
applied to the plaintiff in *Horton*, we considered whether the
size of the award to the plaintiff that remained was suffi-
ciently "substantial" to be constitutionally adequate. *Id*. We
recognized that the remedy the legislature provided, when
considered next to the particular facts of the case, was "not
sufficient *** to compensate plaintiff for the full extent
of the injuries that her son suffered." *Id*. But we decided
that the cap was constitutional as applied to the plaintiff,

saying that "the remedy that the legislature has provided represents a far more substantial remedy than [a] paltry fraction" of the remedy that the jury had determined was appropriate. *Id.*

After stating our holding, we emphasized that it was "limited to the circumstances that this case presents, and it turns on the presence of the state's constitutionally recognized interest in sovereign immunity, the *quid pro quo* that the Tort Claims Act provides, and the tort claims limits in this case." *Id.* at 225. We "express[ed] no opinion on whether other types of damages caps, which do not implicate the state's constitutionally recognized interest in sovereign immunity and which are not part of a similar *quid pro quo*, comply with Article I, section 10." *Id.*

## ANALYSIS

The damages cap at issue here is one of those "other types of damages caps." It is now codified at ORS 31.710(1), and it provides:

> "Except for claims subject to ORS 30.260 to 30.300 [the Oregon Tort Claims Act] and ORS chapter 656 [workers compensation claims], in any civil action seeking damages arising out of bodily injury, including emotional injury or distress, death or property damages of any one person including claims for loss of care, comfort, companionship and society and loss of consortium, the amount awarded for noneconomic damages shall not exceed $500,000."

Additionally, ORS 31.710(4) provides that the jury shall not be advised of that limitation on damages. Thus, the damages cap at issue here is a cap on the amount that a trial court may award a plaintiff after a jury verdict in the plaintiff's favor for claims *other than* claims against public bodies or their employees. For claims against private entities and individuals, other than claims that are "subject to * * * chapter 656," ORS 31.710(1) imposes a cap of $500,000 on all noneconomic damage awards.

Because ORS 31.710(1) is not a cap imposed by the Oregon Tort Claims Act, *Horton* does not directly govern the result here. *Horton* does, however, provide the framework for our analysis. Like the statute at issue in *Horton*, ORS

31.710 does not modify the common-law duty that a defendant owes a plaintiff—to act with reasonable care. Instead, it limits, without eliminating, the remedy that an injured plaintiff may recover for injuries caused by a breach of that duty. Before we undertake a *Horton* analysis of the constitutionality of that cap, however, we first address defendant's argument that a pre-*Horton* case—*Greist*—is controlling.

Defendant is correct to call *Greist* to our attention; in *Greist* we considered the constitutionality of the very statute that is at issue here and held that, as applied in that case, the $500,000 limit on the plaintiff's noneconomic damages did not violate the remedy clause.[7] *See Greist*, 322 Or at 291 (rejecting the plaintiff's argument under Article I, section 10). Nevertheless, for the reasons that follow, we conclude that *Horton*, rather than *Greist*, controls the result in this case.

*Greist* was a wrongful death case. The plaintiff in *Greist* was the personal representative of her son's estate, and she brought a wrongful death action after she and her son were rear-ended by a five-axle truck and trailer while travelling from California to Oregon. *Id.* at 285. The plaintiff's son, who was 10 months old at the time, was thrown from the vehicle and was killed. *Id.* The plaintiff brought suit under ORS 30.020, which provides a claim for relief for wrongful death. *Id.* After a trial, the jury returned a verdict for the plaintiff, awarding $100,000 in economic damages and $1.5 million in noneconomic damages. *Id.* at 286. The trial court applied the damages cap, which, as it does today, capped recovery of noneconomic damages at $500,000, and reduced the plaintiff's noneconomic damages award to that sum. *Id.* The plaintiff appealed, arguing, among other things, that the application of the damages cap violated Article I, section 10. *Id.* at 289.

This court affirmed, concluding that other "decisions from this court discussing Article I, section 10, dispose of [the] plaintiff's argument." *Id.* at 290. In reaching that conclusion, we specifically relied on *Hale v. Port of Portland*,

---

[7] *Greist v. Phillips*, 322 Or 281, 906 P2d 789 (1995), involved *former* ORS 18.560 (1987), which was renumbered ORS 31.710 in 2003. The text of the statute has not changed since *Greist* was decided.

308 Or 508, 783 P2d 506 (1989)—a decision in which this court validated the damages cap imposed by a prior version of the Oregon Tort Claims Act. In *Hale*, the plaintiff's claim was against a municipal corporation, not, as in *Horton*, a state entity, and we relied on a different *quid pro quo* to validate the cap:

> "The class of plaintiffs [who can seek a remedy under the Oregon Tort Claims Act] has been widened by the legislature by removing the requirement that an injured party show that the municipal corporation's activity that led to the injury was a proprietary one. At the same time, however, a limit has been placed on the size of the award that may be recovered. A benefit has been conferred, but a counterbalancing burden has been imposed. This may work to the disadvantage of some, while it will work to the advantage of others. But all who had a remedy continue to have one."

*Hale*, 308 Or at 523.[8] We also added the following thought:

> "[Prior cases from this court] held only that Article I, section 10, is not violated when the legislature alters (or even abolishes) a cause of action, so long as the party injured is not left entirely without a remedy. Under those cases, the remedy need not be precisely of the same type or extent; it is enough that the *remedy* is a *substantial* one."

*Id.* at 523 (emphases added).

     *Greist* focused on that latter cue from *Hale*. In *Greist*, this court began its remedy-clause analysis without first discussing whether the legislature had provided plaintiffs with a *quid pro quo* in exchange for a limited remedy. This court observed, however, that a wrongful death action

---

[8] In his concurrence, Justice Linde explained the *quid pro quo* differently. He noted that the Port is a public entity partaking of sovereign immunity. *Hale*, 308 Or at 530 (Linde, J., concurring). When the Tort Claims Act limits the plaintiff's remedy against the Port, he said, it "provides a new, though limited, remedy against the Port rather than takes away an old one." *Id.*; *see also* David Schuman, *The Right to a Remedy*, 65 Temple L Rev 1197, 1221 (1992) (describing *Hale* as an example of "a quid pro quo interpretation of the remedy clause"). Justice Linde indicated that the result might not be the same for a claim against a city, citing *Batdorff v. Oregon City*, 53 Or 402, 100 P 937 (1909), for the proposition that this court has allowed "legislative immunization of cities from tort liability only on condition that the individuals who are personally responsible for harm qualifying as a legal injury remain liable." *Hale*, 308 Or at 530 (Linde, J., concurring).

is a statutory claim that was not cognizable at common law and that it always had been subject to a damages cap. *Greist*, 322 Or at 294.[9] Then, on the way to our holding that "[i]n relation to that history, the present remedy [was] substantial," we also referenced the *amount* that the plaintiff had been awarded. *Id.* at 291. We said that the plaintiff's remedy was "substantial, not only because 100 percent of economic damages plus up to $500,000 in noneconomic damages is a substantial *amount*, but also because the statutory wrongful death action in Oregon has had a low limit on recovery for 113 years of its 133-year history." *Id.* (emphasis added).

In this case, defendant asks that we pluck from *Greist* the notion that recovery of 100 percent of a plaintiff's economic damages plus $500,000 in noneconomic damages always is a substantial *amount*, and therefore a substantial *remedy*, and leave our constitutional analysis there. Defendant contends that, in this case—a case that is neither a wrongful death action nor a claim against a public entity under the Oregon Tort Claims Act—we need decide only that the *amount* that plaintiff received is "substantial," and that that is sufficient for us to conclude the remedy available to plaintiff under ORS 31.710(1) satisfies the constitutional mandate of Article I, section 10, "in and of itself."

To take a stroke in that direction, however, would be to swim against the tide of *Horton*. In *Horton*, this court did not begin its analysis by assessing whether the *amount* that the plaintiff was awarded after application of the damages cap was relatively small or large, paltry or substantial. Rather, we began by recognizing that doctors owe their patients a duty of due care, that patients have a right to a remedy for a breach of that duty, and that the legislature had not altered the duty imposed on doctors but had limited the remedy available to patients. *Horton*, 359 Or at 221. We then inquired whether the legislature's reasons for imposing

---

[9] Initially, the cap was $5,000, but between 1907 and 1961, the Oregon Legislature increased the cap five different times. *Goheen v. General Motors Corp.*, 263 Or 145, 154 n 16, 502 P2d 223 (1972). In 1961, the cap was set at $25,000. *Id.* In 1967, the legislature removed the cap completely. *Id.* at 154 n 17. Finally, in 1987, the legislature enacted the cap at issue in *Greist* (and in this case), ending "the 20-year hiatus in limitations on the amount of recovery in wrongful death actions." *Greist*, 322 Or at 296.

those limits were sufficiently weighty to counterbalance the Article I, section 10, right to remedy. The factors that we listed as providing that heft were the doctrine of sovereign immunity and its constitutional underpinnings, the state's need to indemnify its employees for liability they incur in carrying out state functions, and the fact that the statute not only limited plaintiffs' remedies, but also provided them with a benefit they would not have otherwise received. *Id*. at 225. As an additional factor, we also cited the legislature's effort to accommodate the interests of injured persons and the efficacy of that effort. *Id*. at 223-24. We relied on the legislature's recognition that the prior tort claim limit of $200,000 was "vastly inadequate" and its assessment of actuarial data to determine how to raise the limit to "provide a complete recovery in many cases" and "greatly expand the state's liability in the most egregious cases." *Horton*, 359 Or at 223. Together, those factors convinced us that the statutory cap could withstand constitutional challenge. *Id*. at 225. Although we also went on to comment that the remedy that the legislature provided was far more substantial than a "paltry fraction" of the jury's award, *id*. at 224, we did so only as a final check on the constitutionality of the cap as applied to the plaintiff. Had we intended that the relative size of the plaintiff's award be determinative "in and of itself," as defendant urges, then the opinion would have started, rather than ended, there.

We recognize that *Horton* did not overrule *Greist*, and we also need not overrule it to conclude that it is not controlling. Here, it is only necessary to observe that *Greist* did not rely solely on the amount or relative size of the plaintiff's award to uphold the applicable damages cap, and that any other reading of *Greist* would be contrary to *Horton*. We also disagree with defendant that *Howell*, another case decided before *Horton*, compels a different result.

In *Howell,* the majority read *Greist* as premised on two independent conclusions—that the plaintiff's award of $600,000 "was a substantial award, in and of itself," and that the award was substantial "because the statutory wrongful death action in Oregon has had a low limit on recovery." *Howell*, 353 Or at 379-80. But, in *Howell*, the court did not rest its decision to uphold the damages cap at issue

in that case—the cap on economic and noneconomic damages imposed by the Oregon Tort Claims Act—only on the amount of the plaintiff's award. The court also compared the cap at issue in *Howell* to the cap at issue in *Hale*, and it concluded that "a similar *quid pro quo* may be seen to apply." *Howell*, 353 Or at 376. It is true that, in *Howell*, the court said that the case before it was "even more like *Greist*," *id.* at 376, but viewing both *Greist* and *Howell* from *Horton*'s perspective, we conclude that both cases are best understood as upholding limits on damages for reasons in addition to the relative amount of the plaintiff's award. To the extent that *Greist* or *Howell* can be read to require that sole focus, we disavow them.

We therefore reject defendant's argument that *Greist* controls our decision in this case, and we also reject defendant's suggestion that, independent of *Greist*, the relative size of a plaintiff's award determines the constitutionality of a damages cap. Under *Horton*, the question of whether a damages cap survives a remedy-clause challenge is not determined solely, or even significantly, by calculating the difference between the damages awarded by a jury and the award permitted by statute and making a judicial assessment of whether the two are so disparate that some adjectival label (substantial or insubstantial, paltry or emasculated) applies. Such an assessment is appropriate as a final check to ensure that, even if the legislature's reasons for adopting a damages cap are constitutionally sufficient, the plaintiff has received a constitutionally sufficient remedy. But no remedy-clause decision from *Hale* to *Horton* has rested solely on an algebraic comparison of the amount of damages awarded by the jury to the amount the plaintiff may recover in accordance with a damages cap, and we also decline to rest our decision in this case on such a comparison.

Having rejected defendant's first argument that the limited damages award that plaintiff received in this case was constitutionally adequate because the amount of the award was "substantial" and adequate "in and of itself," we turn to defendant's second argument—that plaintiff's award was "substantial" and adequate considering the nature and purpose of noneconomic damages. In advancing that argument, defendant contends that the "subtext" of our opinions

in *Greist* and *Clarke* seems to be that noneconomic damages are different from economic damages and that the remedy clause is more protective of the latter. According to defendant, the nature and purposes of economic and noneconomic damages explains the different treatment, and defendant urges that we adopt a rule that noneconomic damages are of lesser constitutional import.

Defendant is correct that economic and noneconomic damages are different in some regards. For one thing, as the legislature defines them, economic damages are objectively verifiable; noneconomic damages are not.[10] But it is what those types of damages have in common that is important for purposes of Article I, section 10. Article I, section 10, places a substantive limit on the legislature's ability to modify the remedy for personal injuries. Both economic and noneconomic damages are intended to compensate a plaintiff for such injuries. *See* ORS 31.710(1)(a)-(b) (defining both economic and noneconomic damages as "losses"); *Van Lom v. Schneiderman*, 187 Or 89, 107, 210 P2d 461 (1949), *overruled in part on other grounds by Oberg v. Honda Motor Co.*, 320 Or 544, 888 P2d 8 (1995) (distinguishing between compensatory damages, "which fully compensate plaintiff for his loss, including injury to his feelings, mental anguish, humiliation, and the like" and punitive damages, which "are allowed over" compensatory damages to "punish the defendant" and "to deter others from committing a like offense"); *Black's Law Dictionary* 489 (11th ed 2019)

---

[10] Economic damages are defined by ORS 31.710(2)(a) as:

"[O]bjectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less."

Noneconomic damages are defined by ORS 31.710(2)(b) as:

"[S]ubjective, nonmonetary losses, including but not limited to pain, mental suffering, emotional distress, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful employment."

(defining "compensatory damages" as "[d]amages sufficient in amount to indemnify the injured person for the loss suffered"); *Black's* at 1336 (defining "pain and suffering" as "[p]hysical discomfort or emotional distress compensable as an element of noneconomic damages in torts").

At the time the remedy clause was adopted, the common law allowed recovery for both tangible and intangible injuries, such as mental anguish and insult. *See, e.g.*, *Clarke*, 343 Or at 608 ("There is no dispute that, when Oregon adopted its remedy guarantee, plaintiff would have been entitled to seek and, if successful, to recover both types of damages from the individual defendants."); *DeMendoza v. Huffman*, 334 Or 425, 438, 51 P3d 1232 (2002) (discussing the historical development of punitive damages, as compared to compensatory damages, in American courts);[11] *Oliver v. North Pacific Transp. Co.*, 3 Or 84, 87 (1869) (explaining that when "estimating" damages for personal injury, "it is proper to consider loss of time, money necessarily paid or debts necessarily incurred in curing the bodily injury, and whatever bodily pain it may have caused to the plaintiff"). Today, Oregon law continues to permit plaintiffs to seek and to have a jury award what it deems an amount that can compensate plaintiff for both types of losses.

Given the compensatory purpose of both economic and noneconomic damages, defendant does not persuade us that this court has treated or should treat any difference in those damages as significant in our remedy-clause analysis. In the Article I, section 10, cases that defendant cites, this court did not rely on a distinction between economic and noneconomic damages for its conclusions. *Greist*

---

[11] *DeMendoza v. Huffman*, 334 Or 425, 438, 51 P3d 1232 (2002), examined the debate amongst courts and legal scholars as to what should be recoverable as compensatory damages and what should be recoverable as punitive damages at the time the Oregon Constitution was adopted. This court assumed that the founders were aware of that debate and the cases surrounding it when they adopted Article I, section 10. *Id.* at 437. *DeMendoza* concluded that, "around the time the Oregon Constitution was drafted in 1857, most courts and commentators viewed punitive damages as a means by which society could punish and deter egregious behavior and not as a 'remedy' for an injured party." *Id.* at 442. Because punitive damages are not a "remedy" for an injured person, the remedy clause of Article I, section 10, does not protect a plaintiff's right to receive such damages. *Id.* at 445-46.

fails to mention, must less rely on, such a distinction. In *Clarke*, this court noted that the "paltry" amount that the plaintiff was awarded did not even compensate him for the economic damages that he had incurred, but we did so only to emphasize the extent and severity of the plaintiff's injuries. *See Clarke*, 343 Or at 609 ("We view plaintiff's economic damages of over $12 million as representative of the enormous cost of lifetime medical care currently associated with permanent and severe personal injuries caused by the medical negligence of a state officer, agent, or employee."). And, in *Clarke*, we did not rely on that fact alone as the basis for our decision that the damages cap was unconstitutional as applied to the plaintiff in that case. Rather, we explained that plaintiff had suffered noneconomic damages of $5,000,000 in addition to his economic damages, and we stated that, "when Oregon adopted its remedy guarantee, plaintiff would have been entitled to seek and, if successful, to recover *both types of damages* from the individual defendants." *Id.* at 608 (emphasis added).

Moreover, the distinction that defendant makes is not significant in our constitutional analysis as laid out by *Horton*. Under *Horton*, our task is not to determine whether the limited recovery permitted by a statutory damages cap is substantial "in and of itself." Our task under *Horton* is to determine whether a plaintiff's remedy is constitutionally sufficient, considering "the extent to which the legislature has departed from the common-law model measured against its reasons for doing so." 359 Or at 220. We reject defendant's argument that any statute that limits a plaintiff's recovery of noneconomic damages, while permitting the plaintiff to fully recover economic damages meets the requirements of Article I, section 10, "in and of itself."

That takes us to defendant's third and final argument—that the legislature's reasons for enacting the damages cap in ORS 31.710 render it constitutional. That argument is on the mark; the reasons for the legislature's actions in enacting a damages cap are critical under *Horton*. Therefore, we turn to the reasons that defendant cites for the cap in ORS 31.710(1): (1) the legislature sought to address the availability and affordability of insurance; and (2) the

legislature adopted the cap as a tradeoff to the "broadening" of tort liability that had occurred in the 1960s and 1970s.

We have no doubt that ORS 31.710(1) was intended to reduce insurance costs and improve insurance availability. *See Greist*, 322 Or at 299 n 10 (recognizing that cap was intended to control the escalating costs of the tort compensation system and that the legislature determined that cap would reduce litigation and premium costs). Proponents of the cap on noneconomic damages explained that it was designed to make insurance awards more predictable and lead to a reduction in "claim severity," reducing insurance costs and thereby increasing availability. *See* Testimony, Senate Committee on Judiciary, Senate Bill (SB) 323, Feb 3, 1987, Ex A (statement of John Holmes) (describing a "dramatic increase" in size of verdicts); Testimony, Senate Committee on Judiciary, SB 323, Feb 5, 1987, Ex K (statement of Ed Patterson and Oregon Association of Hospitals) (describing increase in "claim severity" and asserting that payments for "pain and suffering" are "variable and subjective"). The statute also may have been intended to offset earlier extensions of liability. Defendant points to legislative history showing that a noneconomic damages cap was so described. *See* Testimony, Senate Committee on Judiciary, SB 323, Feb 3, 1987, Ex A (statement of John Holmes) (describing adoption of strict liability, abolishment of doctrines such as charitable immunity, contributory negligence as complete defense, and guest-passenger laws).

Plaintiff does not contest defendant's description of the reasons for the legislature's adoption of ORS 31.710(1). Instead, plaintiff argues that, in enacting that statute, the legislature did not provide a *quid pro quo*, and that the "failure to provide a *quid pro quo* when an established remedy is reduced or eliminated violates the remedy clause."

Plaintiff states his latter argument too broadly: There have been instances in which this court has upheld statutes against a remedy-clause challenge without relying on the existence of a *quid pro quo. See Horton*, 359 Or at 219; (citing *Perozzi v. Ganiere*, 149 Or 330, 348, 40 P2d 1009 (1935)). As *Horton* explains, we have upheld statutes that modify common-law duties, or even, on occasion, eliminate

common-law causes of action "when the premises underlying those duties and causes of action have changed." *Horton*, 359 Or at 219. In assessing the constitutionality of such statutes, we have considered "whether the common-law cause of action that was modified continues to protect core interests against injury to person, property, or reputation or whether, in light of changed conditions, the legislature permissibly could conclude that those interests no longer require the protection formerly afforded to them." *Id.* at 219-20 (citing *Norwest v. Presbyterian Intercommunity Hospital*, 293 Or 543, 563, 652 P2d 318 (1982)).[12]

Plaintiff is correct, however, that when this court has upheld statutes that do not modify a common-law duty but limit the remedies available for their breach, a *quid pro quo* has often been present. *See, e.g.*, *Horton*, 359 Or at 225 (explaining that decision turns in part on the "*quid pro quo* that the Tort Claims Act provides"); *Howell*, 353 Or at 376

---

[12] The statutes cited by the dissent, 366 Or at 664 (Balmer, J., dissenting), in which the legislature has limited the liability of "Good Samaritans" or others who report or disclose important information fall into this category. However, another statute that the dissent discusses—ORS 31.715—does not fit easily into that or any of the three *Horton* categories. That statute was the subject of this court's decision in *Lawson v. Hoke*, 339 Or 253, 119 P3d 210 (2005). There, the court treated that statute differently than others subject to challenge under Article I, section 10, because the court determined that it does not deny a plaintiff a remedy. *Id.* at 261. In *Lawson*, the court explained that the plaintiff was in violation of a law requiring that she have insurance to drive on a public highway, and, we said, "it lay entirely within this plaintiff's control to be fully qualified to be awarded all damages arising out of the kind of harm that she suffered." *Id*. We reasoned that ORS 31.715 was "illustrative of a common theme": "Early in our nation's (and our state's) history, a plaintiff who would not have suffered the injury complained of had he or she obeyed the law could be denied the right to recover damages for his or her injuries." *Id.* at 264. Similarly, we said, "[i]f plaintiff had complied with [the statute precluding her from driving without insurance], she would not have been on the road at the time that defendant committed the traffic infraction that caused the accident." *Id.* at 265. We rejected the plaintiff's remedy-clause argument not because we concluded that the reasons for the legislature's actions were constitutionally sufficient to counterbalance the plaintiff's right to remedy, as required by *Horton*, but because "we conclude[d] that no 'absolute common-law right' that existed when the Oregon Constitution was drafted in 1857 would have guaranteed plaintiff a remedy for her injuries—either economic or noneconomic—under the circumstances of this case." *Id.* Under *Horton*, that analysis is no longer pertinent. *See Horton*, 359 Or at 218-21 (explaining that *Smothers* was incorrectly decided because the remedy clause does not "lock[] courts and the legislature into a static conception of the common law as it existed in 1857," and that, "to the extent that [our previous remedy-clause cases] turn on the bright line rule that *Smothers* drew *** then those cases must be taken with a grain of salt").

(explaining that a "*quid pro quo* may be seen to apply"); *Hale*, 308 Or at 523 (explaining that "a benefit has been conferred, but a counterbalancing burden has been imposed").

Those cases do not establish that a *quid pro quo* always will be necessary, or even sufficient, to sustain such a statute against a remedy-clause challenge. In *Horton*, for instance, the court relied on a number of factors in addition to the *quid pro quo* that it identified in concluding that the damages cap at issue there did not violate the remedy clause. But what those cases do tell us is that the right to remedy is a substantive right "ensuring the availability of a remedy for persons injured in their person, property, and reputation to remedy for injury to person." *Horton*, 359 Or at 218. And, as we said in *Horton*, "common-law causes of action and remedies provide a baseline for measuring the extent to which subsequent legislation conforms to the basic principles of the remedy clause." *Id.* at 218-19. We erred when we concluded in *Smothers* that the remedy clause prohibits the legislature from eliminating any common-law remedy that existed in 1857, but we also would err if we were to decide, at the other extreme, that the legislature is entitled to modify common-law remedies for any reason it deems sufficient. Under *Horton*, the legislature must act for a reason sufficient to counterbalance the substantive right that Article I, section 10, grants. That right assures that people who are injured in their person, property or reputation have a remedy for those injuries. Oregon law has long recognized and protected that substantive right.

Under the common law, all persons owe a duty of reasonable care and persons who are injured as a result of breach of that duty have a right to bring a claim for their injuries. *See Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 16, 734 P2d 1326 (1987) (explaining common-law cases referred to a duty owed to "every person in our society" to avoid foreseeable risk of harm). In adopting ORS 31.710(1), the legislature did not alter the common-law duty of reasonable care and it did not alter a plaintiff's common-law right to bring a claim for breach of that duty. The legislature also did not bar a grievously injured plaintiff from seeking and having a jury award a sum that the jury determines is necessary to compensate the plaintiff for the right that was

injured, including both economic and noneconomic damages. *See* ORS 31.710(4) ("The jury shall not be advised of the limitation set forth in [ORS 31.710(1)].").

Instead, when the legislature enacted ORS 31.710(1), it required a trial court to override the jury's verdict and enter judgment for a specified amount that is not tied to the extent of the plaintiff's injuries. When it did so, the legislature did not provide injured persons with a *quid pro quo* as that term is used in *Horton*—something they otherwise would not have had. Unlike the Oregon Tort Claims Act, which gives injured persons the ability to bring a claim against a solvent defendant that otherwise would have been immune from suit, *id.* at 221-22, ORS 31.710(1) does not expressly confer a benefit on injured persons. The benefits that ORS 31.710(1) is intended to confer are benefits that are intended to inure to society in general as opposed to injured persons in particular.

The failure to provide a *quid pro quo* to counterbalance a plaintiff's right to a remedy under Article I, section 10, strikes a real blow to the defense of ORS 31.710(1). We need not decide today, however, whether that blow is fatal. In addition to the legislature's failure to provide a *quid pro quo*, it also is evident that the legislature did not act, as the legislature did when it adopted the Oregon Tort Claims Act, to advance the state's interest in sovereign immunity or any other interest with constitutional underpinnings. And the legislative history does not indicate that, when the legislature capped plaintiffs' noneconomic damages at $500,000, it did so, again as the legislature did when it adopted the Oregon Tort Claims Act, with the goal of capping noneconomic damages at a sum capable of restoring the right that had been injured in many, if not all, instances, and would remain capable of doing so over time.[13] *See Horton*, 359 Or

---

[13] As noted, in *Horton*, this court noted that the legislature had accounted for inflation when it enacted the damages cap under the Oregon Tort Claims Act. 359 Or at 223. The legislature did not account for inflation when it enacted ORS 31.710(1) in 1987. In 1987, $500,000 had about the same buying power as $1,159,941.55 has today. *See Consumer Price Index Inflation Calculator*, available at https://data.bls.gov/cgi-bin/cpicalc.pl (last accessed July 6, 2020) (calculated to determine the buying power of $500,000 in January of 1987 as compared to January of 2020).

at 223 (explaining that legislature had considered such factors). If the legislature provided a counterbalance for plaintiff's loss of his right to a remedy, it is not apparent here.

In enacting the damages cap in ORS 31.710(1), the legislature left defendants' common-law duty of care intact, but deprived injured plaintiffs of the right to recover damages assessed for breach of that duty. Defendant does not convince us that the reasons for that limitation are sufficient to counterbalance that loss, and we need not rely solely on the lack of a *quid pro quo* to reach our decision. We conclude that application of ORS 31.710(1), as a limit on the noneconomic damages that a court can award to a plaintiff, violates Article I, section 10.

The decision of the Court of Appeals is affirmed. The decision of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**LANDAU, S. J.,** specially concurring in part and dissenting in part.

I continue to believe that the remedy guarantee of Article I, section 10, should not be interpreted to constrain the authority of the legislature to determine rights and remedies. *See Horton v. OHSU*, 359 Or 168, 254-56, 376 P3d 998 (2016) (Landau, J., concurring). Even assuming that it does have that effect, I agree with Justice Balmer that, given this court's case law, ORS 31.710(1) does not violate Article I, section 10. I nevertheless agree with majority that the statute violates the Oregon Constitution. Unlike the majority, though, I would rest that conclusion on the right to a jury trial guaranteed in Article I, section 17, as this court held in *Lakin v. Senco Products, Inc.*, 329 Or 62, 987 P2d 463 (1999). I'm well aware of the fact that this court overruled *Lakin* in *Horton*. I voted with the majority in *Horton* to do just that. I believe that we were mistaken.

My concern about the erroneous overruling of *Lakin* is rooted in considerations of *stare decisis*. The majority in *Horton* reconsidered *Lakin* because of the "disarray among our Article I, section 17, cases." *Horton*, 359 Or at 234. We found it difficult to reconcile *Lakin* with subsequent decisions, especially *DeMendoza v. Huffman*, 334 Or 425, 51 P3d

1232 (2002). *Horton*, 359 Or at 359. In light of the reported conflict, we reconsidered *Lakin* from scratch and ultimately decided that the decision had been wrongly decided. *Horton*, 359 Or at 250. On reflection, I don't think we were right on either count.

First, although we were undoubtedly correct in *Horton* that there is a certain amount of tension among the court's jury-trial cases,[1] on reflection I have a hard time concluding that the jury-trial decisions are in any greater "disarray" than the court's remedy-clause cases are. The remedy-clause cases for over a century have been notoriously contradictory. *See, e.g.*, David Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution*, 65 Or L Rev 35, 36 (1986) ("[T]he remedy clause has not occasioned a coherent body of case law leading to anything that could be called an 'interpretation.'").

In *Templeton v. Linn County*, 22 Or 313, 316, 29 P 795 (1892), the court concluded that the remedy clause doesn't constrain the legislature at all. In *Mattson v. Astoria*, 39 Or 577, 580, 65 P 1066 (1901), the court said yes, it does. Then in *Perozzi v. Ganiere*, 149 Or 330, 345, 40 P2d 1009 (1935), the court said no, it doesn't. The court in *Smothers v. Gresham Transport, Inc.*, 332 Or 83, 123-24, 23 P3d 333 (2001), said yes, it does, but only for claims that existed at common law in 1857. *Horton* then said that *Smothers* was wrong in temporally limiting the effect of the remedy guarantee but otherwise was correct. *Horton*, 359 Or at 218.

What a mess. Yet in *Horton* the majority opinion bent over backwards to find a way to reconcile those inconsistencies, for example, drawing distinctions among the cases on their facts or by reference to whether the defendants were municipal entities. *Horton*, 359 Or at 188-89. Our gloss on those decisions, though, tended to overlook the court's own earlier assessments that its cases are fundamentally at odds. *See, e.g.*, *Neher v. Chartier*, 319 Or 417, 423, 879

---

[1] The case law, for example, applied different standards depending on whether the issue was a right to a jury trial (regarded as a "procedural" right), under *M. K. F. v. Miramontes*, 352 Or 401, 287 P3d 1045 (2012), and a right to the jury's decision (a "substantive" right), under *Hughes v. PeaceHealth*, 344 Or 142, 178 P3d 225 (2008).

P2d 156 (1994) (noting that the case law "throughout the nineteenth and twentieth centuries interpreting Article I, section 10, \*\*\* has failed definitively to establish and consistently to apply any one theory regarding the protections afforded by the remedies guarantee"); *Smothers*, 332 Or at 90 ("[T]his court has not developed a consistent body of law interpreting the remedy clause of Article I, section 10.").

In reviewing the jury-trial cases, we were much less forgiving. In particular, we complained that "*DeMendoza* cannot be fairly reconciled with *Lakin*." *Horton*, 359 Or at 231. In *DeMendoza*, it will be recalled, the court had concluded that a law directing that 60 percent of punitive damages awarded to a party be distributed to the state did not violate the right to a jury trial. 334 Or at 447. The plaintiffs had argued that the law depriving them of 100 percent of the punitive damages awarded by the jury violated *Lakin* and the jury-trial guarantee of Article I, section 17. *Id.* at 446. The court responded that there was no violation of the jury-trial guarantee and no inconsistency with *Lakin*. As the court explained, because the plaintiffs had no right to punitive damages in the first place, they could not complain that a law depriving them of 100 percent of such an award was unlawful. *Id.* at 447.

In *Horton*, though, we gave short shrift to that explanation. We didn't explain why the court's own prior attempt to reconcile the two cases in *DeMendoza* wasn't at least plausible. We simply disagreed with it. What's more, as Justice Walters pointed out in her dissenting opinion in *Horton*, the court could well have drawn a distinction between reducing an award on the one hand and redistributing it on the other. 359 Or at 304 (Walters, J., dissenting). We didn't respond to that point. Similarly, Justice Walters suggested that, regardless of the possibility of an inconsistency between *DeMendoza* and *Lakin* on the issue of punitive damages, the two cases remain entirely consistent as to whether a plaintiff has a right to receive a jury's award of compensatory damages. *Horton*, 359 Or at 304 (Walters, J., dissenting). We didn't respond to that point, either.[2]

---

[2] The majority opinion discussed four other post-*Lakin* decisions, as examples of the "disarray" in the jury-trial case law. First, it briefly mentioned *Jensen*

In short, it's difficult for me to read *Horton* and not conclude that our opinion is internally inconsistent—that the charitable standard that we applied in reviewing remedy-clause cases for some unexplained reason didn't apply to our review of jury-clause cases.

Second, as a result of the different ways that the majority opinion in *Horton* responded to apparent inconsistencies in its remedy-clause and jury-clause cases, it applied different standards in deciding whether to overrule the relevant precedents. In the case of the remedy-clause case law, the opinion's glossing over the inconsistencies that I've mentioned allowed it, in effect, to put a thumb on the scale when evaluating whether to overrule *Smothers* entirely.

Take as one example among many how the majority in *Horton* reviewed the significance of the writings of Edward Coke and William Blackstone. The opinion acknowledged that those writings actually focused on the crown's interference with access to common-law courts—not legislative alteration of rights and remedies, as had been suggested in *Smothers*. *Horton*, 359 Or at 204. The majority went so far as to say that its reading of William Blackstone, *Commentaries on the Laws of England* (1st ed 1765), in *Smothers* on just that point had been in error. *Id*. at 203 ("*Smothers* appears to have misperceived what Blackstone said."). Nevertheless, it explained, "[e]ven if that is the better understanding" of those sources, there is enough ambiguity in them to defeat the assertion that *Smothers* is "clearly at odds" with them. *Horton*, 359 Or at 205.

---

*v. Whitlow*, 334 Or 412, 51 P3d 599 (2002), which held that Article I, section 17, did not preclude the legislature from eliminating a cause of action and posed no inconsistency with *Lakin* at all. *Horton*, 359 Or at 228. Second, it discussed *Hughes*, a case in which the court concluded that Article I, section 17, did not prohibit the legislature from capping damages in wrongful death actions because such actions did not exist at common law. 344 Or at 156-57. The majority in *Horton* noted that *the dissent* in that case had argued that the court's decision could not be reconciled with *Lakin*, but it didn't otherwise describe any inconsistency between *Hughes* and *Lakin*. *Horton*, 359 Or at 231-32. Third, the opinion addressed *Miramontes*, which involved a different issue of when a person is entitled to a jury at all, not whether the person is entitled to the jury's decision. *Horton*, 359 Or at 232-33 (discussing *Miramontes*, 352 Or at 404). Finally, we addressed *Klutschkowski v. PeaceHealth*, 354 Or 150, 194-96, 311 P3d 461 (2013), in which the court had followed *Lakin*. *Horton*, 359 Or at 233-34. The "disarray" in the case law, in other words, really came down to a supposed conflict between only two decisions—*Lakin* and *DeMendoza*.

The majority in *Horton* took a different tack in reconsidering *Lakin*. We didn't determine whether *Lakin* was "clearly at odds" with the text or history of Article I, section 17. Rather, we concluded that *Lakin* was just wrong. Consider again the way we treated Blackstone's *Commentaries*, which said that the civil jury trial was valuable because those in power would know that their actions could "be examined and decided by twelve different men \*\*\*, and that, once the fact is ascertained, the law must of course redress it." Blackstone, 3 *Commentaries* at 380.[3] We granted that the statement "arguably" suggests that the jury right was understood to have substantive—not merely procedural—force. *Horton*, 359 Or at 238. But, while such a plausible reading of Blackstone was enough to save *Smothers*, it wasn't enough to save *Lakin*. We simply declared, *ipse dixit*, that the statement "did not reflect an understanding that the jury's fact-finding ability imposed a substantive limitation" on the authority of the legislature or the courts. *Horton*, 359 Or at 238.

More significantly, in its analysis of the historical roots of the right to a jury trial, the majority opinion in *Horton* never identified any source demonstrating that *Lakin* was actually wrong in construing the jury guarantee of Article I, section 17, to include a substantive dimension. We found only that various historical sources had not addressed the point. Blackstone, we said (notwithstanding the foregoing quote), "did not suggest that the right to a civil jury trial imposed a substantive limit on the ability of either the common-law courts or parliament to define the legal principles that create and limit a person's liability." *Horton*, 359 Or at 238. Similarly, we could not find in early state constitutions "any substantive limitation \*\*\* that the right to a civil jury trial placed on a state legislature's ability to define civil causes of action or damages." *Id*. at 239. We cited Hamilton's discussion of the jury trial in *The Federalist No. 83* and noted that his arguments "do not suggest that the right was viewed as a substantive limit on Congress's lawmaking power." *Horton*,

---

[3] Blackstone similarly said that it is the jury's province to "assess the damages \*\*\* sustained by the plaintiff, in consequence of the injury" and that, if "damages are to be recovered, a jury must \*\*\* assess them." Blackstone, 3 *Commentaries* at 376.

359 Or at 241. We likewise examined the speeches of anti-federalists during the ratification debates and observed that, although many insisted on a constitutional right to a civil jury trial, their remarks "did not reflect a belief that the right to a civil jury trial would impose a substantive limitation on legislatures." *Id.* at 242.

In short, our careful review of the historical sources revealed an absence of evidence that *Lakin* was right, not the existence of evidence that *Lakin* was wrong. To rely on what the historical record doesn't reveal, though, is to employ what historians call the "fallacy of the negative proof." *See, e.g.*, David Hackett Fischer, *Historians' Fallacies: Toward a Logic of Historical Thought* 47-48 (1970). It's at least plausible that various historical sources don't mention the idea that the right to a jury trial has a substantive effect because the subject hadn't come up at that point in time, not because they affirmatively disclaimed such an effect.

In this regard, I can't help but recall *State v. Ciancanelli*, 339 Or 282, 292-319, 121 P3d 613 (2005). In *Ciancanelli*, the court reviewed in painstaking detail the history of free-expression law from the sixteenth century on and acknowledged that the great weight of authority was contrary to the sort of analysis that the court had previously adopted in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982). *See Ciancanelli*, 339 Or at 299 (noting that, "during the late eighteenth and early nineteenth centuries, most American courts and legal treatises tended to treat the right of free speech as a very limited one"). Still, the court concluded, *Robertson* is at least arguably consistent with other strains of thinking at the time of the American revolution. There was no evidence that anyone in Oregon actually concurred in those other strains of thinking. *See id.* at 309. But there was no evidence to the contrary, either. As a result, the court concluded, *Robertson* couldn't be overruled. *Ciancanelli*, 339 Or at 314.[4] I'm at a loss to understand how our decision to overrule *Lakin* can be reconciled with that standard.

---

[4] I have argued that the court got it wrong in *Ciancanelli*—as a matter of history—in asserting the existence of such alternative strains of thinking about free expression in the mid-nineteenth century. Jack L. Landau, *An Introduction to Oregon Constitutional Interpretation*, 55 Willamette L Rev 261, 317 n 364 (2019). But that's a different point.

I'm aware that only a few years have passed since this court handed down its decision in *Horton*. I think that the recency of the decision actually weighs in favor of confronting its error. In *Horton* itself, the court noted that it felt comfortable overruling a portion of *Smothers* because "*Smothers* is of relatively recent vintage, [15 years,] and it has not given rise to the sort of reliance interests" that the court had held in other cases might foreclose reconsideration of older precedents. *Horton*, 359 Or at 187. The same undeniably is true here, where the decision at issue was rendered only four years ago, and few intervening precedents have relied on it. In fact—as the opening sentence of the majority's opinion in this case declares—this is the very first case to apply *Horton*. 366 Or at 630.

As I said at the outset, I voted with the majority in *Horton*. I regret that I did so. But the fact that insight comes belatedly doesn't mean that it should be ignored. I would renounce *Horton* and revive *Lakin*.

The court has declined to reconsider its decision in *Horton*, at least in this case. I wouldn't take that as a signal that the court will never do so. Perhaps it's reluctant to take on the issue because the plaintiffs here assert no more than the majority in *Horton* was wrong in overruling *Lakin*. Entertaining that sort of argument gives rise to suggestions that the nature of constitutional rights depends on the makeup of the court at any given point in time. Fair enough.

The argument that I'm making here is different. My argument is not that *Horton* was wrong and *Lakin* was right on the merits (although I think that may be so, as well). Instead, my argument is that *Horton* erred in failing to follow the court's precedents governing the reevaluation of prior case law. Those precedents have significance apart from principles pertaining to the scope of the right to a jury trial. They speak to the credibility of the court. It's one thing to confront an irreconcilable conflict in decisions, in which case the court must simply decide that one or the other is correct. *See, e.g.*, *Couey v. Atkins*, 357 Or 460, 486, 355 P3d 866 (2015) (*stare decisis* gives way when the court confronts cases with diametrically opposed holdings). In the absence

of such an irreconcilable conflict, though, the burden is—and must be—higher. As the court declared in *Couey*, "*stare decisis* does not permit this court to revisit a prior decision merely because the court's current members may hold a different view than its predecessors about a particular issue." *Id*. at 485. Rather, it must be shown that prior case law was "clearly incorrect—that is, it finds no support in the text or history of the relevant constitutional provision." *Id*. at 485-86.

In my view, the majority in *Horton* failed to establish any irreconcilable conflicts in the court's Article I, section 17, cases or that *Lakin* was "clearly incorrect." As a result, *Lakin* shouldn't have been overruled. I suggest that, in an appropriate future case, parties develop the argument that *Horton* failed to apply proper principles of *stare decisis* in deciding to overrule *Lakin* and that, as a result, *Horton* itself should be overruled.

**BALMER, J.,** dissenting.

I respectfully dissent. As the majority, the concurrence, and many commentators point out, our decisions regarding the remedy clause are consistently inconsistent. The majority does not attempt to sort out the precedents, but it can hardly be faulted for that. Indeed, the majority generally follows this court's analysis in *Horton v. OHSU*, 359 Or 168, 376 P3d 998 (2016), although it articulates the analytical framework in somewhat more categorical terms than *Horton* did.

And yet the result in *Horton* was a holding that a legislatively established damages cap that allowed the plaintiff *less than half* of the economic damages awarded by the jury ($3 million out of $6 million) and *none* of the non-economic damages ($0 out of $6 million) did *not* violate the remedy clause, 359 Or at 173, while the result here is that a legislatively established damages cap that leaves untouched all of plaintiff's economic damages ($3 million out of $3 million) and a small but not insignificant fraction of his noneconomic damages ($500,000 out of $10.5 million) *does* violate the remedy clause. Of course, the majority explains the reasons for those arguably conflicting results at some length,

and I discuss that analysis briefly below. At the end of the day, however, those inconsistent results are part of the basis for my view that the majority fails to give the legislature the same kind of latitude that we approved in *Horton*. More fundamentally, the majority does not give the legislature the latitude I believe it has under the Oregon Constitution to adjust common law and statutory rights and remedies in the civil justice system to meet what it perceives to be the needs of the public.

I first describe why I believe the majority's resolution of this case is not compelled by our prior decisions. I then consider whether our existing cases would permit noneconomic damages to be treated differently from economic damages for remedy-clause purposes, as a negative answer to that question appears to be a critical aspect of the majority's analysis—and one that this court has not considered in much depth in earlier cases or, indeed, in this one. I conclude by discussing the nature of noneconomic damages and why, in my view, it is within the plenary power of the legislature to legislate regarding them if it chooses to do so.

## OUR EARLIER DECISIONS LEAVE OPEN
## THE ISSUE PRESENTED HERE

I agree with important aspects of the majority opinion. First, if we were writing on a clean slate, I would probably agree with Justice Landau's concurrence in *Horton* that the remedy clause was not intended to impose any kind of *substantive* limit on the legislative adjustment of rights and remedies.[1] However, Oregon courts for more than 150 years have held—in many cases, but not all, *see, e.g.*, *Perozzi v. Ganiere*, 149 Or 330, 345, 40 P2d 1009 (1935)— that the remedy clause imposes *some* kind of substantive limit on the extent to which the legislature may modify or abolish existing rights and remedies. This court reaffirmed that view in *Horton* and does so again in this case, and I

---

[1] *See Horton*, 359 Or at 255-56 (Landau, J., concurring) ("At best, the wording of the constitution and the historical circumstances surrounding its adoption fairly may be read to support a general principle that the remedy provision precludes legislative interference with judicial independence and access to the courts, but not that it limits the legislature's authority to determine substantive rights and remedies * * *.").

agree. There is simply too much water under the bridge to go back to what the framers of Article I, section 10, likely intended it to mean and to ignore or overturn so many of our cases.

Second, the majority, like the court in *Horton*, holds that the concept of "substantiality" plays a role in remedy-clause analysis and that a statute providing only an "insubstantial" remedy for a plaintiff's injury violates the remedy clause.[2] The majority's references to "substantiality" are important here because they make clear that the majority does *not* hold that the remedy clause prohibits any cap that would prevent a plaintiff from recovering the full amount that a jury might award in noneconomic damages. The majority notes that the level of the cap at issue here was not based on a legislative finding that "it would be capable of restoring the right that had been injured in many, if not all, instances," 366 Or at 651, indicating that a cap that met that test would be permissible, at least in certain circumstances. The majority could not make that statement if it agreed with the assertion by plaintiff's counsel at oral argument that a $500,000 cap imposed on a jury verdict for noneconomic damages of $500,001 would violate the remedy clause. The majority appears to hold—consistent with *Horton*—that a remedy can be "substantial," and sufficient for remedy-clause purposes, even if it does not provide the injured party with the entire amount of noneconomic damages awarded by the jury. I agree.

Where I disagree with the majority is in its conclusion that defendant "does not convince us that the

---

[2] *See* 366 Or at 638-39, 643, 644. To be sure, the majority's reframing of the *Horton* analysis states that assessing whether a remedy is "substantial" is simply a "final check" on constitutionality, to be considered after various other steps and "*even if* the legislature's reasons for adopting a damages cap are constitutionally sufficient." *Id.* (emphasis added). The majority thus seems to relegate "substantiality" to an afterthought in its remedy-clause analysis. That is incorrect. Almost all of our recent cases—*Horton*, *Clarke v. OHSU*, 343 Or 581, 175 P3d 418 (2007), *Howell v. Boyle*, 353 Or 359, 298 P3d 1 (2013), and this case—have been "as applied," rather than facial, challenges. In each one we have considered whether the remedy was "substantial," along with other aspects of the statute in question, such as whether it was based on a *quid pro quo*. We rejected a facial remedy-clause challenge to a damages cap in the Oregon Tort Claims Act in *Jensen v. Whitlow*, 334 Or 412, 421, 51 P3d 599 (2002), and presumably would reject any facial challenge to ORS 31.710(1) for the same reasons.

reasons for the limitation [on noneconomic damages in ORS 31.710(1)] are sufficient to counterbalance" plaintiff's loss of the common-law right to recover those damages, and "we need not rely solely on the lack of a *quid pro quo* to reach our decision." 366 Or at 651. The reasons that the majority is "not convince[d]" are not altogether clear. The majority recognizes that the cap on noneconomic damages was passed in the 1980s to address the legislature's concern with the threat of rising insurance costs and insurance availability, as we discussed in *Greist v. Phillips*, 322 Or 281, 906 P2d 789 (1995). 366 Or at 648. In *Greist*, we upheld the same statute at issue here, finding that a judgment that provided the plaintiff with all of the economic damages ($100,000) and $500,000 of the $1.5 million noneconomic damages awarded by the jury did not violate the remedy clause because the plaintiff "ha[d] not been left without a remedy," 322 Or at 291, and, indeed, that the remedy in that case was "substantial." *Id.* The majority now says, however, that the 1987 legislature "did not act, as the legislature did when it adopted the Oregon Tort Claims Act (OTCA), to advance the state's interest in sovereign immunity or any other interest with constitutional underpinnings." 366 Or at 651. But that conclusory statement does not adequately explain why, if the damages caps in *Horton* and *Greist* did not violate the remedy clause, the damage cap here (again, the same cap at issue in *Greist*) does.

While one could distinguish *Horton* as an OTCA/ *quid pro quo* case and *Greist* as a wrongful death case not cognizable at common law but instead based on a statute, it is unclear to me why those differences should matter. The majority suggests that the policy interests advanced by the legislature here are not comparable—by which it must mean lacking sufficient "heft"—to those at issue in *Horton* because they are not interests of "sovereign immunity or *** with constitutional underpinnings." 366 Or at 651. But the majority does not explain why the legislature's constitutional authority to enact laws for what it determines to be the good of the state is less important than sovereign immunity. To the extent the majority views sovereign immunity as a constitutional doctrine, it is incorrect. In *Hale v. Port of Portland*, 308 Or 508, 515, 783 P2d 506 (1981), we stated

that the defendant was incorrect in arguing that the reference to sovereign immunity in Article IV, section 24, of the Oregon Constitution, "established sovereign immunity as a constitutional doctrine."[3] Rather, sovereign immunity was a common-law doctrine that "was part of this state's law at the time of statehood *** [and s]tatehood did not change the law." *Id.* at 514. In *Horton* we, somewhat generously, described the doctrine as having "constitutional underpinnings," 359 Or at 221, but it was always a common-law doctrine and not a constitutional grant of immunity to state or local governments; indeed, the reference in Article IV, section 24, speaks specifically of allowing legislation that would *waive* sovereign immunity.

I see no reasonable basis for suggesting that the state's interest in sovereign immunity is more important or has more constitutional "heft" than other interests that the legislature has decided to protect or adjust or modify to achieve particular policy goals. In *Lawson v. Hoke*, 339 Or 253, 119 P3d 210 (2005), this court rejected a remedy-clause challenge to ORS 31.715(1), a statute that explicitly precludes uninsured drivers from recovering noneconomic damages for injuries sustained in an action arising out of the operation of a motor vehicle. Although the court agreed with the plaintiff that the common law at the time the remedy clause was adopted would have recognized a claim for noneconomic damages arising from the negligence of another driver, it nevertheless upheld the "legislature's ability to choose a particular legal device as a way to advance a particular public policy." *Id.* at 256. It described the legislature's choice "of precluding an award of certain forms of civil damages to those who violate the policy in question—compulsory automobile insurance—as a kind of 'stick' to encourage persons to abide by that policy" and held that the "legislative choice *** is a constitutionally permissible one." *Id.*

---

[3] Article IV, section 24, provides that:

"Provision may be made by general law, for bringing suit against the State, as to all liabilities originating after, or existing at the time of the adoption of this Constitution; but no special act authorizeing [*sic*] such suit to be brought, or making compensation to any person claiming damages against the State, shall ever be passed."

Similarly, as I noted in my concurring opinion in *Clarke*, the legislature has sought to encourage certain actions by members of the public by enacting "Good Samaritan" statutes that limit the circumstances in which a person injured by another who provides emergency medical assistance, transportation assistance, or defibrillator treatment can recover damages. 343 Or at 617 (Balmer, J., concurring) (citing ORS 30.800; ORS 30.807; ORS 30.802). Other statutes provide limited immunity for individuals who report suspected child abuse, ORS 419B.025, or who disclose information about a former employee to a new employer, ORS 30.178. In each of those statutes, the legislature limited a person's Article I, section 10 right to "remedy *** for injury done him in his person ***." But in each instance, the legislature acted to advance a specific policy. I assume that those statutes do not violate the remedy clause, and nothing in the majority opinion or any other opinion from this court is to the contrary.

To summarize, in order to advance specific public policies, the legislature often has modified the otherwise applicable rules of common-law negligence and the remedies for such negligence. Most relevant here, it has barred the recovery of noneconomic damages to incentivize drivers to purchase required insurance, *see Lawson*, 339 Or at 256; it has capped total damages—economic and noneconomic— that are recoverable from government bodies and their employees—the cap we upheld in *Horton*. 359 Or at 172- 73. And, in the statute at issue here, ORS 31.710(1), it has capped noneconomic damages—the cap we upheld in *Greist*. 322 Or at 300.

## NONECONOMIC DAMAGES ARE QUALITATIVELY DIFFERENT FROM ECONOMIC DAMAGES

As the majority explains, ORS 31.710(1) was part of the legislative response to a perceived crisis in the insurance market as a result of expanding tort liability and large damage awards in the 1960s and 1970s, including rapidly rising medical malpractice insurance premiums. It amended a number of statutes in ways that were intended to help reduce premiums and stabilize that market. Whether or not that "crisis" was overblown, whether the supposed

"reforms" were good policy or bad policy, or whether the legislative changes had their intended effect is neither here nor there, as far as this court is concerned. The relevant point is that the legislature, based on studies, reports, and hearings, exercised its plenary power to enact laws that it believed advanced important policy goals for the state, including the limitation on noneconomic damages, and those laws are entitled to substantial weight. That brings us back to the question of whether *this* legislatively enacted limit on damages violates the remedy clause.

The legislature chose not to limit the recovery of "economic damages" suffered by those who have suffered injury to their person, property, or reputation—the "objectively verifiable monetary losses," including lost income, medical expenses, the value of property. Instead, it focused solely on noneconomic damages. Much of defendant's argument that the cap here does not violate the remedy clause is based on the differences between economic and noneconomic damages. The majority declares itself "not persuade[d]" that the difference between economic and noneconomic damages is relevant for remedy-clause purposes. 366 Or at 646. It first asserts that it must not be important because *Greist* did not rely on the distinction. But there was no reason for the court to even mention the difference in *Greist*, because the verdict there was for $100,000 in economic damages (which was unaffected by the cap) and $1.5 million for noneconomic damages (of which the plaintiff received $500,000). 322 Or at 286. And, in *Clarke*, we emphasized that the $200,000 cap at the time—$100,000 for economic damages and $100,000 for noneconomic damages—was a tiny fraction of the plaintiff's $12 million in *economic* damages, although that fact, of course, was not the only reason we found the cap unconstitutional as applied to the verdict there. 343 Or at 609.

This court never has examined in detail the differences between noneconomic and economic damages for remedy-clause purposes, nor does the majority do so today. I agree with the majority that Oregon law historically and, I believe, correctly, has allowed recovery of damages for intangible injuries, what we now call noneconomic damages. *DeMendoza v. Huffman*, 334 Or 425, 438, 51 P3d 1232

(2002). I also agree that such damages provide "remedy" for injuries—although necessarily in a different way than damages that compensate for medical bills, lost income, and other financial consequences of injuries. Such remedial damages—economic and noneconomic—are different from punitive damages, which are intended to punish the tortfeasor and not to compensate the injured person. *Id.* at 442, 445-46. Thus, it may be that a statute that eliminated noneconomic damages altogether would violate the remedy clause, although that issue, of course, is not before us today.

But that does not mean that the distinction between economic and noneconomic damages is irrelevant for remedy-clause purposes. Accepting, as I do, that noneconomic damages are not merely symbolic but are "real" damages in the sense that they help remedy the pain and suffering that an injured plaintiff has unquestionably suffered, that does not mean that those damages are exactly like economic damages. Rather, in my view, for some of the same reasons that statutory limits on other common-law rights and remedies, such as those discussed above, are permissible under Article I, section 10, the differences between noneconomic and economic damages can justify different treatment of such damages by the legislature.

The differences between economic and noneconomic damages—and the reasons it is appropriate to consider them differently for remedy-clause purposes—begin with the controlling statutory definitions. "Economic damages" means "objectively verifiable monetary losses," including medical expenses, lost income, and impairment of earning capacity. ORS 31.710(2)(a). "Noneconomic damages" means "subjective, nonmonetary losses" including "pain, mental suffering, emotional distress," among other noneconomic harms. ORS 31.710(2)(b). Although both types of damages are for "losses," the statutes recognize how fundamentally different they are in concept: "*objectively veritable monetary* losses" and "*subjective nonmonetary* losses." Because of the explicitly "subjective" nature of noneconomic damages, they cannot be verified and there is no objective standard or measure for such damages, other than the dollar amount awarded by the jury. *See DeMaris v. Whittier*, 280 Or 25, 29, 569 P2d 605 (1977) ("There is no standard for the measurement of

pain and suffering."). Moreover, although an injured person or family members or experts may testify about an injured person's pain, suffering, and distress, because the loss is subjective to the plaintiff, it is difficult for a defendant to disprove a plaintiff's assertion of emotional distress or other suffering.

Both parties cite Dobbs's *Law of Remedies*, but both parties cite only the sentences that support their position and thus fail to grapple with the unavoidable ambiguity of noneconomic damages. Plaintiff quotes Dobbs as recognizing that "the pain for which recovery is allowed includes virtually any form of conscious suffering, both emotional and physical." Dan B. Dobbs, 2 *Law of Remedies* § 8.1(4), 381 (2d ed 1993). Defendant refers to the author's equally important description of the difficulty of conceptualizing damages for that kind of harm:

> "There is no clear legal or even medical conception of pain. Even so, courts not only award damages for it but often say that these damages are compensatory in nature. Yet it seems clear that damages for pain and suffering are not compensation in any ordinary sense in that they make the plaintiff whole or replace what has been lost, since the damages are not pecuniary and since there is no market in pain and suffering by which the damages could be estimated."

*Id.* at 382. And Dobbs concludes by emphasizing the absence of any meaningful standard for measuring noneconomic damages:

> "Because the award for pain does not reflect economic loss, it is difficult to establish workable standards of measurement. * * * The result is that there is almost no standard for measuring pain and suffering damages, or even a conception of those damages or what they represent. Courts have usually been content to say that pain and suffering damages should amount to 'fair compensation' or a 'reasonable amount,' without any more definite guide."

*Id.* at 383.

The absence of any standard for measuring noneconomic damages is made explicit in Uniform Civil Jury Instruction 70.02, which was given in this case. After summarizing the statute, the instruction goes on to say:

"The law does not furnish you with any fixed standard by which to measure the exact amount of noneconomic damages. However, the law requires that all damages awarded must be reasonable. You must apply your own considered judgment, therefore, to determine the amount of noneconomic damages."

In contrast to many other jurisdictions, the procedure of remittitur that allows an excessive verdict to be reduced by the trial court or resubmitted to the jury is not available in Oregon. *State ex rel Young v. Crookham*, 290 Or 61, 68, 618 P2d 1268 (1980). Indeed, the only limit on noneconomic damages is the amount pled in the complaint. *See* ORCP 67 C ("A judgment *** exceeding the amount prayed for in the pleadings may not be rendered ***.").

Not surprisingly, given the absence of any standard or measure, "verdicts vary enormously, raising substantial doubts whether the law is evenhanded in the administration of damages awards or whether in fact it merely invites the administration of biases or against individual parties." Dobbs, 2 *Law of Remedies* § 8.1(4) at 398-99. *See also* Blumstein *et al*, *Beyond Tort Reform: Developing Better Tools for Assessing Damages for Personal Injury*, 8 Yale J on Reg 171, 172 (1991). The same absence of any standard for measuring noneconomic damages also means that an appellate court is simply unable to review any jury award of noneconomic damages. As long as there is some evidence in the record that the plaintiff "subjective[ly]" experienced "pain, mental suffering, or emotional distress" as a result of defendant's tortious conduct, an award of noneconomic damages is essentially unreviewable because there is simply no basis to "verify" the award or any "objective" standard against which to measure it.

Noneconomic damage awards have been described as an example of "incoherent" judgments, because, although we hope that "the similarly situated are treated similarly," plaintiffs receiving such awards typically are not. Cass R. Sunstein *et al*, *Predictably Incoherent Judgments*, 54 Stan L Rev 1153, 1154 (2002). Contributing to the arbitrariness of such judgments are many factors, including that a jury hears the facts of the case before it in insolation from other

cases, *id.* at 1156, rather than being presented with the patterns of behavior of multiple defendants or the pain and suffering of multiple injured persons.  At most, juries and other decisionmakers may assess damages based on the *category* of cases into which they place the case before them— slip and fall, medical malpractice, personal injury caused by a drunk driver. Those informal categories, however, are strongly influenced by the lawyers' framing of the case. A category's boundaries are fuzzy, *id.* at 1172, and "category-bound" thinking leads to decisions that are inconsistent.[4] *Id.* at 1173.

And noneconomic damages—again in contrast to economic damages based on verifiable losses—are particularly susceptible to "anchoring," the well-documented phenomenon that jury awards are heavily influenced by the amount the plaintiff asks for, "simply because juries often have few other relevant dollar figures from which to begin." *Id.* at 1168 (discussing punitive damages). Research on actual cases and in experimental settings makes clear that "the more you ask for, the more you'll get." Gretchen B. Chapman & Brian H. Bornstein, *The More You Ask for, the More You Get: Anchoring in Personal Injury Verdicts*, 10 Applied Cognitive Psychology 519, 522 (1996); John Campbell *et al*, *Time is Money: An Empirical Assessment of Non-Economic Damages Arguments*, 95 Wash U L Rev 1, 28 (2017).[5]

Despite the potential for incoherent and arbitrary noneconomic damages awards, however, I find nothing inherently wrong, as a purely legal matter, with those

---

[4] "[J]udgments in isolation will predictably produce incoherence from the standpoint of the very people asked to make those judgments." Sunstein *et al*, 54 Stan L Rev at 1202-03.

[5] The noneconomic damages award of $10.5 million here may have been, in part, a result of "anchoring." It is impossible to know, of course, whether jurors consciously or unconsciously decided on that number based entirely on their own assessment of plaintiff's pain and suffering or, in part, based on the prayer in the complaint for $20 million. Suppose the prayer had been for $10 million. Would the verdict have been for that amount? Or might the jury instead have awarded $5 million? The verdict is certainly consistent with the research on the powerful effect of anchoring. *See generally* Daniel Kahneman, *Thinking, Fast and Slow* 119-28 (2011) (discussing anchoring generally).

results.[6] Every day we trust juries to make difficult and consequential decisions in criminal and civil cases. Jurors must follow the court's instructions on the law, of course, but we also value their understanding of community norms, while recognizing the potential for explicit and implicit bias. And we give great weight to jury determinations on matters where standards of review are vague or, as here, essentially nonexistent.

But precisely because noneconomic damages in individual cases are explicitly and inherently "subjective" and receive only the most limited judicial review and, viewed more generally, may be incoherent and arbitrary, it seems to me that the legislature might well choose to exercise its plenary authority over the civil justice system to regulate those damages in some way. Many states have imposed caps on noneconomic damages, while other states have none.[7] Some states cap noneconomic damages only, or at a different level, for medical malpractice cases. And a number of states have constitutional provisions that explicitly prohibit statutory damage caps. As noted previously, Oregon had no general damage cap on common-law negligence claims until 1987 when it imposed the cap on noneconomic damages. The legislature could decide at any time that a cap is no longer appropriate and eliminate the cap. Or it could raise the existing $500,000 cap. Indeed, the legislature has considered raising the current cap a number of times, most recently in the last legislative session where it was proposed that the cap be increased to $1.5 million and that a mechanism be added for changes based on cost of living; however, that measure was ultimately rejected. House Bill 2014 A-Engrossed (2019).

The summary above indicates that the existence and structure of caps on noneconomic damages is a topic

---

[6] Or at least not much that is inherently wrong. To the extent that juries and judges make determinations in civil and criminal cases based on explicit or implicit bias, that seems to raise questions of discrimination, as well as due process and equal protection concerns.

[7] As of 2013, 29 states had some form of statutory cap on noneconomic damages in tort actions, medical malpractice actions, or both. J. Chase Bryan, Walter H. Boone, & Jordan M. Mason, *Are Non-Economic Caps Constitutional?*, 80 Def Counsel J 154, 157 (2013). Of the 17 states where caps had been challenged as unconstitutional, the challenges had been successful in eight states. *Id.*

of substantial policy interest across the country. There are reasonable policy arguments against imposing a cap on noneconomic damages, because those damages provide an added deterrent (in addition to economic damages) to negligence or other misconduct by defendants and also because economic damages may not fully compensate for injuries suffered by some plaintiffs. *See* Lucinda M. Finley, *The Hidden Victims of Tort Reform: Women, Children and the Elderly*, 53 Emory LJ 1263, 1281 (2004); Joanna M. Shepherd, *Tort Reforms' Winners and Losers: The Competing Effects of Care and Activity Levels*, 55 UCLA L Rev 905, 946 (2008). Even some writers with a narrow economic focus conclude that the usual criticisms of awarding damages for pain and suffering are "unsound," because those losses impose opportunity costs and "[p]eople will pay to avoid them and will demand payment to risk incurring them." Richard A. Posner, *Economic Analysis of Law* § 6.12, 229 (9th ed 2014); *see id.* ("Damages awards for pain and suffering, even when apparently generous, may well undercompensate victims crippled by accidents.").[8]

But, as discussed above, there are also reasonable arguments that noneconomic damages awards can be arbitrary and unfair, because they turn entirely on the "subjective, nonmonetary" losses of the plaintiff as assessed by the jury, and cannot be objectively verified, in contrast to economic damages. That fact makes noneconomic damages unpredictable and potentially discriminatory based on race, gender, and other characteristics of the plaintiff. Such awards, it can be argued, undermine the core legal principle that like cases be treated alike, Oscar G. Chase, *Helping Jurors Determine Pain and Suffering Awards*, 23 Hofstra L Rev 763, 769 (1995), and raise equal protection and due process concerns. *See also* Joseph H. King, Jr., *Pain and Suffering, Noneconomic Damages, and the Goals of Tort Law*, 57 SMU L Rev 163, 185 (2004) (subjective nature of

---

[8] It should also be noted that the empirical evidence on the efficacy of caps in achieving their goals of reducing noneconomic damages awards and encouraging settlement is mixed. *See* Greg Pogarsky & Linda Babcock, *Damage Caps, Motivated Anchoring, and Bargaining Impasse*, 30 J Legal Stud 143 (2001); Catherine M. Sharkey, *Unintended Consequences of Medical Malpractice Damages Caps*, 80 NYU L Rev 391 (2005).

noneconomic damages makes them "highly variable, unpredictable, and abjectly arbitrary"); Neil Vidmar, *Empirical Evidence on the Deep Pockets Hypothesis: Jury Awards for Pain and Suffering in Medical Malpractice Cases*, 43 Duke LJ 217, 254 (1993) (juror interviews reveal noneconomic damages based on arbitrary factors, including multiples of medical expenses).

My point is not that a cap on noneconomic damages is a bad idea or a good one. Rather, it is that the nature of noneconomic damages, as outlined above, makes them quite different from economic damages. Courts are particularly ill-equipped to review or set limits on noneconomic damages, and we should not do so. And those realities, I think, should be recognized in our remedy-clause analysis by giving the legislature more leeway to regulate noneconomic damages than we have given it in limiting economic damages, which are inherently limited to objective evidence of monetary losses presented at trial.

The legislature, acting through the usual lawmaking processes and considering policy arguments for and against noneconomic damages, should be able to decide whether to retain the cap that it imposed in 1987, increase the cap, or eliminate it altogether. Or it could consider one of the other approaches to noneconomic damages that have been proposed or adopted elsewhere. *See* Dobbs, 2 *Law of Remedies* § 8.1(4) at 397-400. In *Greist*, we reviewed the reasons the legislature enacted the cap on noneconomic damages in the first place—and rejected the plaintiff's remedy-clause challenge. 322 Or at 297. In *Lawson*, the legislature barred a driver without insurance from recovering any noneconomic damages when injured in a motor vehicle accident—and, again, we found the legislature's reasons for enacting the statute sufficient, rejecting a remedy-clause challenge. 339 Or at 256. Even if we were to construe the remedy clause to prohibit any cap on *economic* damages in a case such as this—a question not before us—in my view, the very different nature of noneconomic damages permits the legislature to regulate in this area in order to advance policy interests that it deems to be important. The legislature did so in enacting the cap in ORS 31.710(1). That

statute is constitutional on its face and as applied to plaintiff here.

For those reasons, I respectfully dissent.

Landau, S. J., joins in this dissenting opinion.